974 So.2d 601 (2008)
STATE of Florida, Appellant,
v.
Eric M. YOUNG, Appellee.
No. 1D06-5798.
District Court of Appeal of Florida, First District.
February 25, 2008.
*605 Bill McCollum, Attorney General, and Christine Ann Guard, Assistant Attorney General, Tallahassee, for Appellant.
Curtis S. Fallgatter of Fallgatter Farmand & Catlin, P.A., Jacksonville, for Appellee.

ON MOTION FOR REHEARING AND CERTIFICATION
LEWIS, J.
We deny the State's motion for rehearing and certification. On our own motion, *606 however, we withdraw our previous opinion and substitute the following.
The State of Florida seeks review of an order granting Eric Young's motion to suppress evidence gathered during a warrantless search of his office and workplace computer, as well as statements obtained from him in a subsequent interrogation. Although Young did not personally consent to the search, the State contends that the search was reasonable under one or all of the following theories: (1) Young had no legitimate expectation of privacy in the office or computer, (2) church officials who consented to the search had authority to do so, and (3) the officers who conducted the search reasonably relied on the church officials' apparent authority to consent. The State also contends that Young's statements were not a product of the search and, therefore, should not have been suppressed in any event. We reject all of these contentions and affirm the order.
At the time of the search, Young was the pastor of Ft. Caroline United Methodist Church ("the church"), a local church under the supervision of the larger United Methodist Church ("the Church"). In the proceedings below, Richard Neal, a district superintendent of the Church, testified regarding the Church's structure, as it related to Young's employment. According to Neal's testimony, the Church is divided into geographical sections known as conferences, and a bishop presides over each conference. Neal explained that bishops appoint pastors after consulting with district superintendents, who supervise the pastors and local churches within their districts. Neal further testified that the Church is governed in accordance with its Book of Discipline and that all pastors agree to be bound by this book when they are ordained.
Young's church was relatively small, with only three full-time staff members: the pastor, a custodian, and a person who served as both the church administrator and the pastor's secretary. Additionally, there was a body within the church known as the staff parish. The church administrator described the staff parish as "the human resources of the church," or the personnel. Although the record is unclear as to the role or authority of the staff parish, the chairperson of staff parish relations testified via deposition that he was not Young's boss or supervisor.
The church provided Young with a desk-top computer and a private office. Although the computer was provided to Young for use in connection with his duties at the church, there was no official policy regarding the use of the computer or others' access to it. Young's computer was not networked to any other computer, and it was kept in his private office. This office had a special lock that could not be opened with the Church's master key. Three keys to Young's office existed. Young kept two of the keys, and the church administrator kept the third key, which she stored in a locked credenza drawer in her office.
According to Young's testimony, a previous pastor had requested the special lock for the office door due to concerns about after-hours intruders. The church administrator testified that she regularly opened the door to Young's office for the custodian and visiting pastors, who occasionally used the office to prepare sermons. However, the church administrator acknowledged that no one was permitted to enter the office without Young's permission. Young testified to this fact himself and added that when he was absent from the office, even the church administrator's access was limited to reasonable business purposes, such as "deliver[ing] paperwork for [him] to *607 sign." Young further testified that the church administrator was not permitted to log on to his computer when he was not physically present.
The events leading to the search of Young's office and computer began when the church administrator received a call from the church's Internet service provider. A representative from that company informed the church administrator that spam had been linked to the church's Internet protocol address. In response to this call, the church administrator ran a "spybot" program on the church's computers. She testified that when she ran the program on Young's computer, she saw "some very questionable [w]eb site addresses." The church administrator then contacted a member of the staff parish and an information technology (IT) person to set up a time to have the computer examined.
Later, the chairperson of staff parish relations, Kenneth Moreland, contacted Neal to inform him of the situation. After discussing the matter with the bishop and getting approval for the decision, Neal instructed Moreland to contact law enforcement officials and allow them to see the computer. The next morning Neal instructed Young not to return to the church until the two could meet and discuss the situation. When officers arrived at the church, Moreland unlocked Young's office and signed "consent to search" forms for the office and computer. Young arrived at the church during the morning when the officers were there. Moreland and an officer instructed Young to leave the property immediately, and he complied.
The two officers who were involved in obtaining consent to search the office and computer testified at the suppression hearing. Both testified that at the time of the search, they understood Moreland to be a "representative of the church" whose authority to consent was based on instructions from a supervisor at the church. Neither of these officers spoke with Moreland's supervisor or asked Moreland further questions about his authority before the search began. One officer testified that she had spoken directly with Neal after she was already inside Young's office. At the time, she knew Neal had never used Young's computer, did not work in Young's office, and did not keep property there. Neal's testimony at the hearing revealed the same information. Similarly, Moreland testified that he did not work in Young's office and did not keep belongings there. However, Neal testified that he had authority to consent to the search and to instruct Young to stay away from the church under the Book of Discipline, by which Young had agreed to be bound when he was ordained.
After searching the office and computer, officers went to another location where Young was meeting with Neal. At that time, an officer advised Young of his Miranda rights,[1] and Young indicated he was willing to talk. During the interview, the officer showed Young a printout from his computer, which contained a list of Web sites Young had bookmarked. The transcript of the interview indicates that the officer was looking at the printout while questioning Young. During the course of the interview, Young made statements relevant to whether he had a subjective expectation of privacy in his office computer. In particular, when the officer asked, "You have no right to privacy on that computer?," Young responded, "I suppose not . . . I hadn't really thought about it." The officer then stated, "It's like me, . . . my laptop in my truck, if my boss says hand it over, he can look at anything that's on *608 there because it's not mine." Young replied, "1 suppose technically you're right." He also made incriminating statements related to child pornography and signed a form giving the officers consent to search a "memory stick" found in his office. Young testified that during the interview, he understood that the officers had been in his office. Statements made by the officer during the interview are consistent with this testimony.
After two hearings, the trial court granted the motion to suppress, finding that, although Neal had authority to consent to the search under the Book of Discipline, he did riot have authority to consent under the constitutions of the United States and Florida. The court concluded that the search and seizure was unlawful and that Young's statements were a product of the unlawful search and seizure. Thus; the trial court held that the items seized in the search and the statements taken in the interview could not be used as evidence at trial.
We consider the Fourth Amendment issues presented in this case under the requirements of the Federal Constitution, as interpreted by the United States Supreme Court. See Art. I, § 12, Fla. Const.; State v. Butler, 655 So.2d 1123, 1125 (Fla.1995). We review the trial court's factual findings to determine whether they are supported by competent substantial evidence, but its application of law to facts is reviewed de novo. See Williams v. State, 721 So.2d 1192, 1193 (Fla. 1st DCA 1998). Recognizing that a trial court's ruling on a motion to suppress is "clothed with the presumption of correctness," we "interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to the trial court's ruling." McNamara v. State, 357 So.2d 410, 412 (Fla. 1978).
To invoke the protection of the Fourth Amendment, a criminal defendant must establish standing by demonstrating a legitimate expectation of privacy in the area searched or the item seized. Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). A legitimate expectation of privacy consists of both a subjective expectation and an objectively reasonable expectation, as determined by societal standards. Smith, 442 U.S. at 740, 99 S.Ct. 2577. The reasonableness of an expectation of privacy in a particular place or item depends on context. O'Connor v. Ortega, 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). Specifically, the reasonableness of an employee's expectation of privacy in his or her office or the items contained therein depends on the "operational realities" of the workplace, id. at 717, 107 S.Ct. 1492, and not on legal possession or ownership. Mancusi v. DeForte, 392 U.S. 364, 369, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). The likelihood that a person has an objectively reasonable expectation of privacy in an office setting is increased where the area or item searched is "reserved for [the defendant's] exclusive personal use." See id. at 368, 88 S.Ct. 2120. Other factors that have been considered in determining the legitimacy of an expectation of privacy in an item seized from an office include the employee's relationship to the item, whether the item was in the employee's immediate control when it was seized, and whether the employee took actions to maintain a sense of privacy in the item. United States v. Anderson, 154 F.3d 1225, 1232 (10th Cir.1998). Many times, an employee may have a legitimate expectation of privacy in his or her personal office and in personal items stored in a desk or file cabinet. See O'Connor, 480 U.S. at 716-18, 107 S.Ct. 1492.
Evaluation of an expectation of privacy in a workplace computer involves *609 unique considerations, but as with any other item in the workplace, the evaluation should focus on the operational realities of the workplace. When a computer is involved, relevant factors include whether the office has a policy regarding the employer's ability to inspect the computer, whether the computer is networked to other computers, and whether the employer (or a department within the agency) regularly monitors computer use. For example, in United States v. Angevin, 281 F.3d 1130 (10th Cir.2002), the court held that a university professor had no legitimate expectation of privacy in his office computer, partly because the university had an extensive policy regarding computer use and provided explicit warnings that the computer would be inspected by university officials. Similarly, in Muick v. Glenayre Electronics, 280 F.3d 741, 742 (7th Cir. 2002), the court observed that an employee had "no right of privacy" in the laptop computer his employer had "lent him for use in the workplace" because the employer had announced that it could inspect the laptop. We agree with these courts that where an employer has a clear policy allowing others to monitor a workplace computer, an employee who uses the computer has no reasonable expectation of privacy in it. In the absence of such a policy, the legitimacy of an expectation of privacy depends on the other circumstances of the workplace.
If these circumstances indicate that the employee has a legitimate expectation of privacy in the place searched or items seized, and the employee has invoked the protection of the Fourth Amendment, the State must prove that the search and seizure was reasonable in order to use the evidence secured in the search and seizure at trial. See State v. Setzler, 667 So.2d 343, 344 (Fla. 1st DCA 1995). A search and seizure is reasonable if it is conducted pursuant to a valid warrant or with valid consent. State v. Purifoy, 740 So.2d 29, 29 (Fla. 1st DCA 1999). Law enforcement officers may obtain valid consent from the individual whose property is searched, someone who has common authority over the premises, or someone who reasonably appears to have common authority over the premises. Illinois v. Rodriguez, 497 U.S. 177, 181, 188-89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (citations omitted).
"Common authority" is derived from "mutual use of the property by persons generally having joint access or control for most purposes." Rodriguez, 497 U.S. at 177, 110 S.Ct. 2793. The legal justification behind the doctrine of common authority is that when two people have mutual use of property, each assumes the risk that the other will permit the area to be searched. See United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Even when a third party has the right to enter the property and inspect it for his or her own purposes, that person does not have constitutional authority to invite law enforcement officers to search the property unless he or she has common authority over the property. See Blanco v. State, 438 So.2d 404, 405 (Fla. 4th DCA 1983) (noting that a landlord's personal right to enter an apartment was distinct from a right to invite police in to search the apartment).
In United States v. Ziegler, 474 F.3d 1184, 1191 (9th Cir.2007), the court considered the consent issue in the context of a workplace computer and reasoned that "the computer is the type of workplace property that reinains within the control of the employer `even if the employee has placed personal items in [it]" Standing alone, this statement suggests a blanket rule that employers always retain common authority over workplace computers. *610 However, the Ziegler court's reasoning was fact-specific. See id. at 1192-93. Notably, in Ziegler, the company had an IT department with complete administrative access to all computers, the company had installed a firewall to monitor Internet traffic, and an employment manual informed employees of such monitoring efforts. Id. at 1192-93. Thus, like the standing inquiry, the question of whether an employer has retained control over a workplace computer sufficient to maintain common authority over the device depends on the operational realities of the workplace.
In some situations, a person who purports to consent to a search may not have actual authority to do so. Law enforcement officers may rely on that person's apparent authority, to give consent, hut only if such reliance is reasonable. See Rodriguez, 497 U.S. at 188-89, 110 S.Ct. 2793. To determine whether an officer's reliance was reasonable, courts presume that the officeewas familiar with the applicable law. See Morse v. State, 604 So.2d 496, 503-04 (Fla. 1st DCA 1992). Then, the proper inquiry is whether a reasonable person familiar with the applicable law would have believed the third party had common authority over the premises or item searched. See Morse, 604 So.2d at 503-04. If the basis for the asserted authority is unclear, the officer must conduct further inquiry before relying on the third party's representations. Id.
If the State fails to prove a search and seizure was reasonable under constitutional standards, any evidence obtained either directly or indirectly therefrom must be excluded from the defendant's criminal trial. Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Evidence that is not obtained during a search, but which is obtained as a result of the unlawful search, must be suppressed under the "fruit of the poisonous tree" doctrine. See id.; Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Evidence is not per se inadmissible "simply because it would not have come to light but for the illegal actions of the police," but the evidence must be excluded from trial if it "has been come at by exploitation of [the] illegality" and was not obtained "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. at 488, 83 S.Ct. 407 (citation omitted). Of course, it is the State's burden to show that the evidence sought to be suppressed was procured by appropriate means. To carry this burden, the State must show "an unequivocal break in the chain of illegality sufficient to dissipate the taint of prior official illegal action" by clear and convincing evidence. Norman v. State, 379 So.2d 643, 647 (Fla.1980). When the defendant seeks to suppress statements, the mere fact that the defendant's statements were voluntary is insufficient, in itself, to meet this burden. See Oregon v. Elstad, 470 U.S. 298, 306, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (stating that where a Fourth Amendment violation taints a confession, the State must meet the threshold requirement of showing that the confession was voluntary and then "show a sufficient break in events to undermine the inference that the confession was caused by" the violation).
Under the facts of the instant case, Young had a legitimate expectation of privacy in his office and his workplace computer. Thus, law enforcement could not properly access the contents of the office or the computer without obtaining a search warrant or valid consent. Because the officers did not have valid consent, the trial court properly suppressed the evidence obtained from the search.
*611 The State contends, based primarily on Young's statements during the interview, that Young had no subjective expectation' of privacy in the office or the computer. However, even considering those equivocal statements, we conclude that Young had a subjective expectation of privacy in the office and computer. This conclusion is based on a review of the totality of the circumstances. Young kept his office locked when he was away, thus taking specific measures to ensure his privacy in the office. When others used the office, the use was for limited purposes. The testimony at the suppression hearing indicated that Young expected no one to peruse his personal belongings in the office or on the computer.
Next, the State contends that Young's expectation of privacy in his office is not an expectation that society is prepared to accept as reasonable. We disagree. The Supreme Court has recognized that there are circumstances under which an employee may have a legitimate expectation of privacy in the workplace and the items contained therein. See O'Connor, 480 U.S. at 716-18, 107 S.Ct. 1492 (finding a legitimate expectation of privacy in a government employee's office, desk, and file cabinets). The facts of the instant case indicate that the church had endowed Young with an expectation of privacy far beyond that which an average employee enjoys. Not only did the church install a special lock on the door, but it supplied only three keys to the door, two of which were in Young's sole possession. Additionally, Young had a recognized practice of allowing visitors into his office only with his permission or for limited purposes related to church business. Although Young's expectation of privacy would be more compelling if he had never allowed another person to use the office, such a condition would be unrealistic in any office setting. Young was required to have an objectively reasonable expectation of privacy, not a compelling expectation. It is difficult to imagine circumstances within a realistic business setting which would give rise to a more legitimate expectation of privacy.
Young also had an objectively reasonable expectation of privacy in his office computer. Although the church owned the computer, Young was the sole regular user. Although the church administrator performed maintenance on the computer, there was no evidence that she or anyone other than Young stored personal files on the computer or used it for any purpose other than maintenance. Unlike in the federal cases finding no expectation of privacy in a workplace computer, the church in the instant case had no written policy or disclaimer regarding the use of the computer. See Angevine, 281 F.3d at 1132-33 (describing a university's extensive policy regarding computer use and monitoring); Muick, 280 F.3d at 742 (noting that an employer's announcement that it could inspect laptop computers "destroyed any reasonable expectation of privacy" the defendant may have had). Specifically, there was no policy informing Young that others at the church could enter his office and view the contents of his computer. The fact that Young's computer was not networked to any other computers further heightens the reasonableness of his expectation of privacy in its files. The only way to access the computer to view its contents was to enter through the locked office door. It is clear under these circumstances that the church trusted Young to use the computer appropriately and that it gave no indication that the computer would be searched by anyone at the church. The fact that Young violated this trust does not detract from a proper analysis of whether he had a legitimate reason to expect that others would not enter his office and inspect the computer.
*612 Testimony at the suppression hearing revealed that the district superintendent had authority to enter the office and inspect the computer under general provisions in the Book of Discipline, which gives district superintendents the responsibility to oversee pastors and local churches. While we do not doubt that the district superintendent had such authority, we observe that this general authority to supervise a pastor is distinguishable from an explicit policy indicating that a computer will be inspected periodically. Thus, based on the other facts of this case, Young's expectation of privacy was legitimate, even in the face of a church policy allowing the district superintendent to supervise him. All employees have supervisors, but many employees may still have a legitimate expectation that others will not examine their personal files, even if these files are brought into the workplace.
Although the district superintendent had personal authority to enter Young's office, and to authorize others to do so, this authority did not displace the law enforcement officers' obligation to respect Young's independent constitutional rights and it did not rise to the level of "common authority" required for valid third party consent. Neither Moreland nor Neal had ever used Young's workplace computer, worked in his office, or kept property there. Instead, the office was kept locked, and the church had no specific policy giving church officials the right to control and use the office. No testimony at the suppression hearing revealed that any church officials had ever exerted such authority over the office. Thus, the State failed to meet its burden to prove that the officials had common authority under constitutional standards, and there was no showing that Young assumed the risk that church officials would invite police officers in to search the office.
The State contends that even if there was no actual authority for the church officials to consent, the officers reasonably relied on the officials' representations of authority. However, the officers' actions do not support a finding of apparent authority. By the officers' own admissions, they knew nothing of Moreland other than the fact that he was a "representative of the church" who had been told by a supervisor to consent to the search. Although the officers were presumably familiar with the law governing third party consent, they made no effort to ascertain whether the consenting officials had any regular access to or control over the office and the computer before commencing the search. Despite the clear indications of Young's autonomy at the church and the officers' lack of knowledge regarding the specific relationship between the supervisor and Young, the officers assumed that the supervisor had the authority to consent. Their actions were not reasonable under constitutional standards. See Rodriguez, 497 U.S. at 188-89, 110 S.Ct. 2793; Morse, 604 So.2d at 503-04 (noting that "[a]n officer cannot always assume an invitation to enter a room is necessarily authorized by the rightful occupant").
For the first time on appeal, the State argued that the trial court had no choice but to accept that the search was proper to avoid a violation of the ecclesiastical abstention doctrine. Because the ecclesiastical abstention doctrine is an issue of subject-matter jurisdiction, Malichi v. Archdiocese of Miami, 945 So.2d 526 (Fla. 1st DCA 2006), we feel compelled to address the State's concerns. Under the ecclesiastical abstention doctrine, civil courts are prohibited from interfering with internal church disputes in order to avoid excessive government entanglement with religion, in accordance with the First *613 Amendment. See id. When matters of church discipline or ecclesiastical government arise between a church and its parishioners, secular courts must accept the decision made by the highest ecclesiastical authority. Id. (quoting Watson v. Jones, 80 U.S.(13 Wall.) 679, 733, 20 L.Ed. 666 (1871)).
In Malicki v. Doe, 814 So.2d 347, 356-57 (Fla.2002), the Florida Supreme Court recognized that the doctrine applies to intra-church disputes, not those between a church and a third party. The Malicki court explained that the purpose behind the prohibition against resolving disputes between churches and their parishioners is to avoid having the state "intervene on behalf of groups espousing particular doctrinal beliefs." Id. (quoting Gen. Council on Fin. & Admin. of the United Methodist Church v. Cal. Superior Court, 439 U.S. 1355, 1372-73, 99 S.Ct. 35, 58 L.Ed.2d 63 (Rehnquist, Circuit Justice 1978)). Ultimately, the court held that there was no First Amendment bar to a suit initiated by parishioners against church officials under a theory of negligent hiring and retention for two reasons: the parishioners were not seeking to regulate conduct rooted in religious belief and the lawsuit was based on a neutral application of a generally applicable principle of law. Id. at 360-61.
In the instant case, the State's reliance on the ecclesiastical abstention doctrine is misplaced primarily because the church is not a party in this case and there has been no attempt to regulate church conduct through the judicial system. This case did not require the trial court to determine whether the church officials exercised proper authority under church doctrine or otherwise interfere with the manner in which the church governs itself. Any interference in church governance posed by the instant case is far less significant than the interference Florida churches must tolerate under Malicki. Because churches can be sued for negligent hiring and retention, Malicki, 814 So.2d at 360-61, churches have a legal obligation to exercise due care in selecting and supervising pastors. In contrast, the instant case does not require the church to conform any policies or conduct to a legal standard. The instant case merely requires law enforcement officers to consider the constitutional restrictions on their own behavior.
Notably, the trial court accepted Neal's testimony that the Book of Discipline gave him the authority to allow others into the pastor's office. In deeming the officers' acts unconstitutional, the court did not interfere with the church's authority or attempt to penalize any person for exercising it. Instead, the court took the limited and appropriate measure of excluding the evidence obtained from the search from use in a court of law. The church had authority to implement its doctrine, but this authority did not extend beyond the realm of religion and did not remove from the court the prerogative of enforcing the rules of evidence and ensuring that government agents comply with the constitutions of the United States and Florida.
Finally, having established that law enforcement officers acted improperly in conducting the search of the office and computer, we turn to the facts surrounding the subsequent interrogation. The State contends that the statements were removed from the original taint because the church had already provided police with a CD containing "questionable images" prior to the search. We disagree. During the interview, the officers showed Young a printout of Web sites he had bookmarked and indicated that they had seized a "memory stick" from his office. Young testified that he was aware the officers had been in his office at the time of the interrogation. *614 The State contends that the printout was from the CD the church had prepared. However, during the interrogation, the officers did not make this distinction to Young, although they clearly communicated to him that they had been in his office. Under these circumstances, we cannot say that Young's willingness to give incriminating statements was unaffected by the illegal search. The State has not pointed to any event or circumstance that broke the chain of illegality. Because the State failed to carry its burden, the trial court properly considered the statements "fruit of the poisonous tree." Like the items seized from Young's office and computer during the search, the interview statements were properly suppressed. Accordingly, the trial court's order is AFFIRMED.
No further motions for rehearing will be entertained. The Clerk is directed to issue the mandate forthwith.
VAN NORTWICK and THOMAS, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).