ON MOTION FOR REHEARING
OSTERHAUS, J.
Ricky Rand seeks rehearing on the basis that we incorrectly relied on objected-to, hearsay testimony of a police officer in reversing the trial court’s decision to suppress evidence in his case. We agree and grant his motion for rehearing, vacate the *662 previous panel opinion, and replace it with this opinion affirming the trial court’s decision.
I.
A Duval County middle school invited the public to use its campus track anytime except for during school hours. It posted signs on the fence saying as much in all capital letters. And it left the gate open to the public at night. When, late one night in March 2014, Mr. Rand began exercising at the track, a school district law enforcement officer saw him and immediately arrested him for trespassing at the track. During the post-arrest search of Mr. Rand’s pockets, the officer found a handgun. The State then charged Mr. Rand for crimes related to carrying the firearm.
The officer didn’t know the school’s open-track policy when he arrested Mr. Rand. He disregarded the signs on the track’s fence authorizing public use of the track after 4 p.m. and before 7 a.m. And he had not before noticed that the school kept the gate open at the track all night long. Mr. Rand moved to suppress the gun evidence, arguing that he wasn’t trespassing and that the school board officer lacked probable cause to arrest him. At the suppression hearing, the State made three substantial concessions. The State conceded first that Mr. Rand wasn’t trespassing, but that the signs on the track’s fence invited and authorized public use of the track at night. The State next conceded that Mr. Rand wasn’t doing anything wrong at the track, but was “in actuality, and in retrospect, ... walking the track.” Finally, the officer conceded that he’d arrested Mr. Rand immediately without any investigation. The officer handcuffed Mr. Rand even as he attempted to explain his legitimate reason for being at the track, and even though the signs inviting public access hung on the fence just feet from where the officer arrested Mr. Rand.
In spite of its various concessions, the State argued under Heien v. North Carolina, — U.S. —, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014), that probable cause remained to arrest and search Mr. Rand because the officer had made a reasonable mistake about the school’s track access policy. Heien excuses “objectively reasonable” legal mistakes by officers that lead to an arrest. But the trial court rejected the State’s argument. While the trial court accepted that the officer didn’t know the track policy, it nevertheless faulted the officer’s ignorance of the obvious posted policy: “There was absolutely no investigation done to determine whether or not the defendant had a lawful reason to be on the property.” The trial court concluded that there was “no competent and substantial evidence [supporting] the arrest.”
We now affirm because the law and evidence support the trial court’s decision. Although probable cause can exist notwithstanding a “reasonable” mistake of law, the school officer’s ignorance and disregard of the school’s posted trespassing policy wasn’t objectively reasonable under these circumstances, where: (1) the school hung conspicuous signs on the fence inviting the public to use its track at night; (2) the school left the gate at the track open at night while locking down access to other parts of the campus; (3) other school officers knew the open-track policy and had confirmed it personally to Mr. Rand; and (4) the evidence indicated that the public used the track after school hours. A reasonable person would not have mistaken the policy, nor believed that a crime was being committed. The school district officer, no different than other officers, must pay attention to the laws he is responsible for enforcing. And “an officer can gain no Fourth Amendment advantage through a *663 sloppy study of the laws he is duty-bound to enforce.” Heien, 135 S.Ct. at 539-40.
II.
A.
A trial court’s ruling on a motion to suppress evidence presents a mixed question of law and fact. Connor v. State, 803 So.2d 598, 608 (Fla. 2001); Robinson v. State, 885 So.2d 951, 953 (Fla. 1st DCA 2004). The standard of review for factual findings is whether competent, substantial evidence supports the trial court’s findings. State v. Young, 974 So.2d 601, 608 (Fla. 1st DCA 2008). We review interpretations of law de novo. Id.; Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). On appeal, a motion to suppress reaches the appellate court “clothed with the presumption of correctness.” McNamara v. State, 357 So.2d 410, 412 (Fla. 1978). The court must review all evidence and make reasonable inferences and deductions from mixed evidence “in a manner most favorable to sustaining [a trial court’s] ruling.” Van Teamer v. State, 108 So.3d 664, 666 (Fla. 1st DCA 2013) (quoting State v. Gandy, 766 So.2d 1234, 1235-36 (Fla. 1st DCA 2000)).
The Florida Constitution further requires that we resolve search and seizure issues “under the requirements of the Federal Constitution, as interpreted by the United States Supreme Court.” Young, 974 So.2d at 608 (citing Art. I, § 12, Fla. Const.; State v. Butler, 655 So.2d 1123, 1125 (Fla. 1995)). Arrests are the most intrusive of Fourth Amendment seizures and require probable cause. An officer has probable cause if “the totality of the facts known to the officer at the time would cause a reasonable person to believe that an offense has been committed.” Van Teamer, 108 So.3d at 666 (quotation omitted). This standard doesn’t foreclose law enforcement officers from approaching and asking questions of suspected trespassers. But it does preclude an officer from immediately arresting and searching individuals in the absence of “specific and articulable facts” indicative of a crime. See Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The court-fashioned “exclusionary rule” requires suppressing evidence that is seized when officers arrest someone without a warrant or probable cause, which is a means of deterring Fourth Amendment violations by government officials who carry out unlawful searches and seizures. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Arizona v. Evans, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995).
B.
A district school board officer arrested Ricky Rand while he exercised at night at the school track just a block from his house. As the officer drove by the school track, he noticed “a black male and dark clothing” across a “very poorly lit” field at the other end of the track. After shining a light on Mr. Rand, Mr. Rand walked over to the police car, where the officer immediately arrested him for being at the track.
But Mr. Rand did not violate any law or school policy by using the school track at night. State trespassing laws gives substantial leeway to schools to invite people onto their campuses. And Mr. Rand did not act unlawfully by accepting the school’s invitation to use its track. See § 810.097(l)(a), Fla. Stat. (defining unlawful trespassing on campus as lacking “legitimate business on the campus or any other authorization, license, or invitation to enter or remain upon the school property”). In fact, the school kept the track open at night and posted signs inviting the public to access the track after school hours. Mr. Rand also had a legitimate reason for *664 being there; he was walking the track. The State conceded during the hearing that it was “not disputing the fact that Mr. Rand ... was walking the track.” This came after the officer had already agreed that no evidence supported the arrest except for his initially seeing Mr. Rand off the track: “all the evidence was consistent with Mr. Rand being there to walk the track, other than ... his location [when the officer] first saw him.”
For the State’s part, it conceded below that the officer made a legal mistake. It acknowledged that the signs on the fence “admittedly would give someone license to use the track during those hours.” The school officer testified that he’d patrolled the school for years and was “very familiar with this property,” but he’d never noticed the signs inviting public to use the track before. The officer admitted that the signs were “essentially an invitation to the public to enter that track on hours that do not conflict with [school].”[1] The officer, however, had failed to read the signs on the fence, or investigate why Mr. Rand was there before arresting him.[2]
In addition to its concessions about the school’s invitation to use the track, Mr. Rand’s exercise, and the lack of an investigation, the State acknowledged that the school left a track-access gate open at night. The open gate gave the public easy access to the track. In Mr. Rand’s case, for instance, he testified to simply walking down the sidewalk from his house and entering the open gate about 60 feet away from the track surface itself. But only after Mr. Rand’s arrest, did the officer bother to confirm that Mr. Rand had entered an open gate at the track.[3] And it wasn’t an anomaly. Pictures and testimony in the record demonstrate that the gates were routinely left open. There were pictures of open gates in the record, taken both during the day and at night, next to signs inviting after hours track use. Mr. Rand wasn’t the only one using the track after school hours; other pictures in the record showed unidentified adults using the track. Other school district officers confirmed to Mr. Rand “that as long as ... the gate is unlocked then the public can have access to it.” And one social media picture posting in the record showed Mr. Rand and his fiancé exercising at night at the track on a different date preceding his arrest.[4]
*665 In sum, the evidence supports what the State conceded at the hearing. Mr. Rand had been invited by the school to use the track at night and had a legitimate reason for being there. He was not trespassing. Mr. Rand’s arrest stemmed not from any wrongdoing, but from an officer’s mistake about the trespassing policy and his failure to investigate. The officer disregarded signs inviting the public to use the track and was unfamiliar with the school’s practice of leaving the track gate open to the public, even while his school officer colleagues knew and had encouraged Mr. Rand’s track usage.
C.
Upon conceding at the hearing that Mr. Rand had a legitimate purpose, license, and an invitation to walk on the campus track at night, the State’s argument turned to the United States Supreme Court’s decision in Heien v. North Carolina. It argued that the officer’s mistaken, but “good faith understanding that anyone on the property at that point was trespassing,” gave him probable cause to arrest and search Mr. Rand for being at the track: “More than two centuries ago, this Court held that reasonable mistakes of law ... could justify a certificate of probable cause.” It is true that Heien stands for the proposition that officers’ mistakes about the law don’t necessarily negate probable cause. Rather, the Fourth Amendment tolerates mistakes and preserves probable cause if “those mistakes — whether of fact or of law — [are] objectively reasonable.” Heien, 135 S.Ct. at 539. In Heien, a North Carolina police officer mistakenly stopped a motor vehicle for a non-working brake light. Unbeknownst to the officer, North Carolina law did not prohibit driving with one non-functioning brake light. During the stop, the officer sought and received permission to search the car and found cocaine. After his arrest, Mr. Heien moved to suppress the drug evidence, arguing that the officer lacked a valid reason for stopping his car. The Court concluded that an “objectively reasonable” mistake of law could justify a suspicion of illegal conduct and avoid application of the exclusionary rule. Id. at 539-40. In Mr. Heien’s case, the Court found that the officer had made a reasonable mistake of law because the text of the North Carolina law gave mixed messages about whether all vehicle brake lights had to be functional. The Court found “little difficulty” finding reasonable suspicion in spite of the officer’s mistake and did not suppress the drug evidence. Id. at 540. “[B]ecause the mistake of law was reasonable, there was reasonable suspicion justifying the stop.” Id.
But this case is different from Heien. Whereas Heien involved an ambiguous law, the officer in this case disregarded a conspicuous school policy posted right on the fence at the track, including right next to the' open gate. These signs confirmed that the school had invited the public to access the1 track. Even though the signs hung just steps from where the officer arrested Mr. Rand, the officer completely disregarded them and failed to investigate whether Mr. Rand’s had a legitimate reason for being'at the track. Furthermore, the evidence' reflects that other officers had no problem understanding and enforcing the correct policy, which they personally confirmed to Mr. Rand. Here, unlike Heien, the- officer’s excuse wasn’t that he misunderstood the legal standard, but that he hadn’t paid attention to it. Under these different circumstances from Heien, an ob *666 jectively reasonable person would not have mistaken the posted policy, misunderstood it, or believed that the school prohibited public access to the track.
We put little stock in the officer’s claimed confusion about the policy stemming from a conversation with the school’s principal, who allegedly once told him that “she wants nobody on campus after hours and nobody should be on campus after hours.” Mr. Rand objected to the hearsay testimony about this conversation and we cannot fault the trial court for discounting it. No school administrator appeared at the hearing to confirm that the school maintained a closed-after-4 p.m. campus policy. More importantly, the officer himself admitted that he didn’t enforce the “nobody on campus” policy ascribed to the principal. Rather, the officer testified to following a different district policy and training that allowed for individuals on campus after hours if they had a legitimate purpose, or were invited to be there. The hearsay evidence doesn’t support the conclusion that the officer’s mistake arose from confusion about a “nobody-on-campus” policy that nobody enforced.[5] What is more, the circumstance-specific trespassing policy that the officer identified as the district policy tends to support the trial court’s final decision to suppress the evidence because the officer didn’t investigate Mr. Rand’s situation. The officer’s own training dictated that he should have determined whether Mr. Rand had an invitation and legitimate reason for being at the track before arresting him for trespassing.
The dissent makes much of the fact that the arrest took place in the middle of the night. But the fact that it was nighttime did not give the officer probable cause to arrest Mr. Rand. The track was open at night, just like many government facilities are open at night — post office lobbies, interstate rest areas, university event venues, campgrounds, parks, and the like. Officers patrolling these places — like the school district officer here — must know basic open-close policies before simply arresting people for being there. People don’t forfeit Fourth Amendment rights by accepting late-hour invitations onto government property.
The dissent also suggests that the officer’s mistake should be excused because he would have inevitably retrieved the gun from Mr. Rand’s pockets anyway. But the State never made this inevitability argument below. See Harrell v. State, 894 So.2d 935, 940 (Fla. 2005) (holding that Florida law requires a party to timely raise an issue with a trial court before it may be properly preserved for appellate review). And, furthermore, there is no evidence that the officer would have retrieved the gun from Mr. Rand in the absence of arresting him. The officer did not testify about needing to pat down Mr. Rand for safety reasons. Indeed, the officer suggested that he wouldn’t have patted Mr. Rand down at the track absent the trespassing:
Had I not had the suspicion I had about the crime ... had I seen him on the track, it would have been a simple, you know, could have been as simple as just walking up to him and talking to him about what he was doing out there and running his name.
*667 The officer also acknowledged that Mr. Rand “did not threaten [him] or oppose [him] in any way,” which doesn’t support the dissent’s speculations that the officer would have found the gun if he’d decided to simply talk with Mr. Rand instead of arresting him. The issue here is not whether the officer had reasonable cause for a Terry stop; this issue was neither raised below or on appeal. Hypothetically, the officer certainly could have chosen the different strategy of simply talking with Mr. Rand, and patting him down if the officer feared for his safety (the trial court acknowledged that it would have been fine to do so). But the officer didn’t choose this alternate course of action, or indicate the need to pat down Mr. Rand. It is not for the appellate court to roam into matters not previously raised. Whether the weapon might have been discovered via a Terry stop is a factual issue that wasn’t developed below. And we aren’t in a position to postulate about unpreserved, hypothetical matters now.
The bottom line here is that the officer disregarded the school’s open-track policy. He said he “didn’t take the time to look at the sign right in front of the gate” and he didn’t investigate Mr. Rand’s reasons for being at the track. Under these circumstances, we find no error in the trial court’s decision not to give the officer’s sloppy work a Fourth Amendment pass.
III.
The law and evidence support the trial court’s decision to apply the exclusionary rule. The trial court’s order granting Mr. Rand’s motion to suppress is AFFIRMED.
JAY, J., CONCURS; KELSEY, J., DISSENTS WITH OPINION.

. Contrary to the claim in the dissenting opinion, there was no evidence that the school posted "No Trespassing” signs anywhere on campus, much less near the track. The only signs posted on the fence were the signs that restricted access during school hours, between 7 a.m, and 4 p.m. At one point, defense counsel referred to these signs as "trespassing signs,” but they did not restrict Mr, Rand’s use of the track at night, just as the State admitted at the suppression hearing.

. The hearing transcript includes the following questions and answers:
Defense counsel: "You, upon making contact with [Mr. Rand], take him into custody for trespassing without incident, correct?”
Officer: "Yes, ma’am.”
Defense counsel: “With no investigation, correct?”
Officer: "Correct.”

. In contrast, the officer testified that the school locked other gates on the property and, in particular, blocked access to the classroom area of campus from the track.

. Mr. Rand and his fiancé worked irregular hours in their respective jobs; he as a taxi driver and she as a night manager at Whata-burger. Mr. Rand often documented his workouts with pictures and Facebook postings updating his miles, times, and other details of “getting the miles in,” which are part of the record. Walking the track wasn’t a new thing for Mr. Rand. He’d exercised at school district tracks without incident for about a year before his arrest after recommitting himself to getting back in shape. He’d lost weight, from 193 pounds down to 168. And in one notable entry made almost a year before his arrest, Mr. Rand posted that ”[t]he track at the high- *665 school close to the public 7 am,” which mirrors the time posted on the fence at the school track in this case.

. The trial court may also have discounted the principal's purported policy because 4 p.m. is a very early hour to lock down a middle school campus. Lots happens on a typical school campus after school hours — teachers grade papers until late in the afternoon, students attend athletic, arts, and club events, parents pick up their students, PTA and other meetings take place, etc. And it simply isn’t credible that the principal wanted the officer to arrest the people he found on campus after school.