IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

STATE OF FLORIDA,

     Appellant,

v.

RICKY ALPHONSO RAND,

     Appellee.

_____/

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D15-335

Opinion filed February 10, 2017.

An appeal from the Circuit Court for Duval County.
Angela Cox, Judge.

Pamela Jo Bondi, Attorney General, Matthew Pavese, Assistant Attorney General,
for Appellant.

Janet E. Johnson and Andrew B. Greenlee of Andrew B. Greenlee, P.A., Tallahassee,
for Appellee.

ON MOTION FOR REHEARING

OSTERHAUS, J.

Ricky Rand seeks rehearing on the basis that we incorrectly relied on objected-to, hearsay testimony of a police officer in reversing the trial court's decision to suppress evidence in his case. We agree and grant his motion for rehearing, vacate the previous panel opinion, and replace it with this opinion

affirming the trial court's decision.

I.

A Duval County middle school invited the public to use its campus track anytime except for during school hours. It posted signs on the fence saying as much in all capital letters. And it left the gate open to the public at night. When, late one night in March 2014, Mr. Rand began exercising at the track, a school district law enforcement officer saw him and immediately arrested him for trespassing at the track. During the post-arrest search of Mr. Rand's pockets, the officer found a handgun. The State then charged Mr. Rand for crimes related to carrying the firearm.

The officer didn't know the school's open-track policy when he arrested Mr. Rand. He disregarded the signs on the track's fence authorizing public use of the track after 4 p.m. and before 7 a.m. And he had not before noticed that the school kept the gate open at the track all night long. Mr. Rand moved to suppress the gun evidence, arguing that he wasn't trespassing and that the school board officer lacked probable cause to arrest him. At the suppression hearing, the State made three substantial concessions. The State conceded first that Mr. Rand wasn't trespassing, but that the signs on the track's fence invited and authorized public use of the track at night. The State next conceded that Mr. Rand wasn't doing anything wrong at the track, but was "in actuality, and in retrospect, . . . walking the track." Finally, the officer conceded that he'd arrested Mr. Rand immediately without any investigation.

2

The officer handcuffed Mr. Rand even as he attempted to explain his legitimate reason for being at the track, and even though the signs inviting public access hung on the fence just feet from where the officer arrested Mr. Rand.

In spite of its various concessions, the State argued under <u>Heien v. North Carolina</u>, 135 S. Ct. 530 (2014), that probable cause remained to arrest and search Mr. Rand because the officer had made a reasonable mistake about the school's track access policy. <u>Heien</u> excuses "objectively reasonable" legal mistakes by officers that lead to an arrest. But the trial court rejected the State's argument. While the trial court accepted that the officer didn't know the track policy, it nevertheless faulted the officer's ignorance of the obvious posted policy: "There was absolutely no investigation done to determine whether or not the defendant had a lawful reason to be on the property." The trial court concluded that there was "no competent and substantial evidence [supporting] the arrest."

We now affirm because the law and evidence support the trial court's decision. Although probable cause can exist notwithstanding a "reasonable" mistake of law, the school officer's ignorance and disregard of the school's posted trespassing policy wasn't objectively reasonable under these circumstances, where: (1) the school hung conspicuous signs on the fence inviting the public to use its track at night; (2) the school left the gate at the track open at night while locking down access to other parts of the campus; (3) other school officers knew the open-track

3

policy and had confirmed it personally to Mr. Rand; and (4) the evidence indicated that the public used the track after school hours. A reasonable person would not have mistaken the policy, nor believed that a crime was being committed. The school district officer, no different than other officers, must pay attention to the laws he is responsible for enforcing. And "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." Heien, 135 S. Ct. at 539-40.

II.

A.

A trial court's ruling on a motion to suppress evidence presents a mixed question of law and fact. Conner v. State, 803 So. 2d 598, 608 (Fla. 2001); Robinson v. State, 885 So. 2d 951, 953 (Fla. 1st DCA 2004). The standard of review for factual findings is whether competent, substantial evidence supports the trial court's findings. State v. Young, 974 So. 2d 601, 608 (Fla. 1st DCA 2008). We review interpretations of law de novo. Id.; Ornelas v. United States, 517 U.S. 690, 697 (1996). On appeal, a motion to suppress reaches the appellate court "clothed with the presumption of correctness." McNamara v. State, 357 So. 2d 410, 412 (Fla. 1978). The court must review all evidence and make reasonable inferences and deductions from mixed evidence "in a manner most favorable to sustaining [a trial court's] ruling." Van Teamer v. State, 108 So. 3d 664, 666 (Fla. 1st DCA 2013)

4

(quoting State v. Gandy, 766 So. 2d 1234, 1235–36 (Fla. 1st DCA 2000)).

The Florida Constitution further requires that we resolve search and seizure issues "under the requirements of the Federal Constitution, as interpreted by the United States Supreme Court." Young, 974 So. 2d at 608 (citing Art. I, § 12, Fla. Const.; State v. Butler, 655 So. 2d 1123, 1125 (Fla. 1995)). Arrests are the most intrusive of Fourth Amendment seizures and require probable cause. An officer has probable cause if "the totality of the facts known to the officer at the time would cause a reasonable person to believe that an offense has been committed." Van Teamer, 108 So. 3d at 666 (quotation omitted). This standard doesn't foreclose law enforcement officers from approaching and asking questions of suspected trespassers. But it does preclude an officer from immediately arresting and searching individuals in the absence of "specific and articulable facts" indicative of a crime. See Terry v. Ohio, 392 U.S. 1, 27 (1968). The court-fashioned "exclusionary rule" requires suppressing evidence that is seized when officers arrest someone without a warrant or probable cause, which is a means of deterring Fourth Amendment violations by government officials who carry out unlawful searches and seizures. See Mapp v. Ohio, 367 U.S. 643 (1961); Arizona v. Evans, 514 U.S. 1 (1995).

## B.

A district school board officer arrested Ricky Rand while he exercised at night

5

at the school track just a block from his house. As the officer drove by the school track, he noticed "a black male and dark clothing" across a "very poorly lit" field at the other end of the track. After shining a light on Mr. Rand, Mr. Rand walked over to the police car, where the officer immediately arrested him for being at the track.

But Mr. Rand did not violate any law or school policy by using the school track at night. State trespassing laws gives substantial leeway to schools to invite people onto their campuses. And Mr. Rand did not act unlawfully by accepting the school's invitation to use its track. See § 810.097(1)(a), Fla. Stat. (defining unlawful trespassing on campus as lacking "legitimate business on the campus or any other authorization, license, or invitation to enter or remain upon the school property"). In fact, the school kept the track open at night and posted signs inviting the public to access the track after school hours. Mr. Rand also had a legitimate reason for being there; he was walking the track. The State conceded during the hearing that it was "not disputing the fact that Mr. Rand . . . was walking the track." This came after the officer had already agreed that no evidence supported the arrest except for his initially seeing Mr. Rand off the track: "all the evidence was consistent with Mr. Rand being there to walk the track, other than . . . his location [when the officer] first saw him."

For the State's part, it conceded below that the officer made a legal mistake. It acknowledged that the signs on the fence "admittedly would give someone license

6

to use the track during those hours." The school officer testified that he'd patrolled the school for years and was "very familiar with this property," but he'd never noticed the signs inviting public to use the track before. The officer admitted that the signs were "essentially an invitation to the public to enter that track on hours that do not conflict with [school]."[1] The officer, however, had failed to read the signs on the fence, or investigate why Mr. Rand was there before arresting him.[2]

In addition to its concessions about the school's invitation to use the track, Mr. Rand's exercise, and the lack of an investigation, the State acknowledged that the school left a track-access gate open at night. The open gate gave the public easy access to the track. In Mr. Rand's case, for instance, he testified to simply walking down the sidewalk from his house and entering the open gate about 60 feet away from the track surface itself. But only after Mr. Rand's arrest, did the officer bother

---

[1] Contrary to the claim in the dissenting opinion, there was no evidence that the school posted "No Trespassing" signs anywhere on campus, much less near the track. The only signs posted on the fence were the signs that restricted access during school hours, between 7 a.m. and 4 p.m. At one point, defense counsel referred to these signs as "trespassing signs," but they did not restrict Mr. Rand's use of the track at night, just as the State admitted at the suppression hearing.

[2] The hearing transcript includes the following questions and answers:
Defense counsel: "You, upon making contact with [Mr. Rand], take him into custody for trespassing without incident, correct?"
Officer: "Yes, ma'am."
Defense counsel: "With no investigation, correct?"
Officer: "Correct."

to confirm that Mr. Rand had entered an open gate at the track.[3] And it wasn't an anomaly. Pictures and testimony in the record demonstrate that the gates were routinely left open. There were pictures of open gates in the record, taken both during the day and at night, next to signs inviting after hours track use. Mr. Rand wasn't the only one using the track after school hours; other pictures in the record showed unidentified adults using the track. Other school district officers confirmed to Mr. Rand "that as long as . . . the gate is unlocked then the public can have access to it." And one social media picture posting in the record showed Mr. Rand and his fiancé exercising at night at the track on a different date preceding his arrest.[4]

In sum, the evidence supports what the State conceded at the hearing. Mr. Rand had been invited by the school to use the track at night and had a legitimate reason for being there. He was not trespassing. Mr. Rand's arrest stemmed not from any wrongdoing, but from an officer's mistake about the trespassing policy and his

---

[3] In contrast, the officer testified that the school locked other gates on the property and, in particular, blocked access to the classroom area of campus from the track.
[4] Mr. Rand and his fiancé worked irregular hours in their respective jobs; he as a taxi driver and she as a night manager at Whataburger. Mr. Rand often documented his workouts with pictures and Facebook postings updating his miles, times, and other details of "getting the miles in," which are part of the record. Walking the track wasn't a new thing for Mr. Rand. He'd exercised at school district tracks without incident for about a year before his arrest after recommitting himself to getting back in shape. He'd lost weight, from 193 pounds down to 168. And in one notable entry made almost a year before his arrest, Mr. Rand posted that "[t]he track at the highschool close to the public 7am," which mirrors the time posted on the fence at the school track in this case.

failure to investigate. The officer disregarded signs inviting the public to use the track and was unfamiliar with the school's practice of leaving the track gate open to the public, even while his school officer colleagues knew and had encouraged Mr. Rand's track usage.

C.

Upon conceding at the hearing that Mr. Rand had a legitimate purpose, license, and an invitation to walk on the campus track at night, the State's argument turned to the United States Supreme Court's decision in Heien v. North Carolina. It argued that the officer's mistaken, but "good faith understanding that anyone on the property at that point was trespassing," gave him probable cause to arrest and search Mr. Rand for being at the track: "More than two centuries ago, this Court held that reasonable mistakes of law . . . could justify a certificate of probable cause." It is true that Heien stands for the proposition that officers' mistakes about the law don't necessarily negate probable cause. Rather, the Fourth Amendment tolerates mistakes and preserves probable cause if "those mistakes—whether of fact or of law—[are] objectively reasonable." Heien, 135 S. Ct. at 539. In Heien, a North Carolina police officer mistakenly stopped a motor vehicle for a non-working brake light. Unbeknownst to the officer, North Carolina law did not prohibit driving with one non-functioning brake light. During the stop, the officer sought and received permission to search the car and found cocaine. After his arrest, Mr. Heien moved

9

to suppress the drug evidence, arguing that the officer lacked a valid reason for stopping his car. The Court concluded that an "objectively reasonable" mistake of law could justify a suspicion of illegal conduct and avoid application of the exclusionary rule. Id. at 539-40. In Mr. Heien's case, the Court found that the officer had made a reasonable mistake of law because the text of the North Carolina law gave mixed messages about whether all vehicle brake lights had to be functional. The Court found "little difficulty" finding reasonable suspicion in spite of the officer's mistake and did not suppress the drug evidence. Id. at 540. "[B]ecause the mistake of law was reasonable, there was reasonable suspicion justifying the stop." Id.

But this case is different from Heien. Whereas Heien involved an ambiguous law, the officer in this case disregarded a conspicuous school policy posted right on the fence at the track, including right next to the open gate. These signs confirmed that the school had invited the public to access the track. Even though the signs hung just steps from where the officer arrested Mr. Rand, the officer completely disregarded them and failed to investigate whether Mr. Rand's had a legitimate reason for being at the track. Furthermore, the evidence reflects that other officers had no problem understanding and enforcing the correct policy, which they personally confirmed to Mr. Rand. Here, unlike Heien, the officer's excuse wasn't that he misunderstood the legal standard, but that he hadn't paid attention to it. Under

10

these different circumstances from <u>Heien</u>, an objectively reasonable person would not have mistaken the posted policy, misunderstood it, or believed that the school prohibited public access to the track.

We put little stock in the officer's claimed confusion about the policy stemming from a conversation with the school's principal, who allegedly once told him that "she wants nobody on campus after hours and nobody should be on campus after hours." Mr. Rand objected to the hearsay testimony about this conversation and we cannot fault the trial court for discounting it. No school administrator appeared at the hearing to confirm that the school maintained a closed-after-4 p.m. campus policy. More importantly, the officer himself admitted that he didn't enforce the "nobody on campus" policy ascribed to the principal. Rather, the officer testified to following a different district policy and training that allowed for individuals on campus after hours if they had a legitimate purpose, or were invited to be there. The hearsay evidence doesn't support the conclusion that the officer's mistake arose from confusion about a "nobody-on-campus" policy that nobody enforced.[5] What is more, the circumstance-specific trespassing policy that the officer identified as the

---

[5] The trial court may also have discounted the principal's purported policy because 4 p.m. is a very early hour to lock down a middle school campus. Lots happens on a typical school campus after school hours—teachers grade papers until late in the afternoon, students attend athletic, arts, and club events, parents pick up their students, PTA and other meetings take place, etc. And it simply isn't credible that the principal wanted the officer to arrest the people he found on campus after school.

11

district policy tends to support the trial court's final decision to suppress the evidence because the officer didn't investigate Mr. Rand's situation. The officer's own training dictated that he should have determined whether Mr. Rand had an invitation and legitimate reason for being at the track before arresting him for trespassing.

The dissent makes much of the fact that the arrest took place in the middle of the night. But the fact that it was nighttime did not give the officer probable cause to arrest Mr. Rand. The track was open at night, just like many government facilities are open at night—post office lobbies, interstate rest areas, university event venues, campgrounds, parks, and the like. Officers patrolling these places—like the school district officer here—must know basic open-close policies before simply arresting people for being there. People don't forfeit Fourth Amendment rights by accepting late-hour invitations onto government property.

The dissent also suggests that the officer's mistake should be excused because he would have inevitably retrieved the gun from Mr. Rand's pockets anyway. But the State never made this inevitability argument below. See Harell v. State, 894 So. 2d 935, 940 (Fla. 2005) (holding that Florida law requires a party to timely raise an issue with a trial court before it may be properly preserved for appellate review). And, furthermore, there is no evidence that the officer would have retrieved the gun from Mr. Rand in the absence of arresting him. The officer did not testify about needing to pat down Mr. Rand for safety reasons. Indeed, the officer suggested that

12

he wouldn't have patted Mr. Rand down at the track absent the trespassing:

> Had I not had the suspicion I had about the crime . . . had I seen him on the track, it would have been a simple, you know, could have been as simple as just walking up to him and talking to him about what he was doing out there and running his name.

The officer also acknowledged that Mr. Rand "did not threaten [him] or oppose [him] in any way," which doesn't support the dissent's speculations that the officer would have found the gun if he'd decided to simply talk with Mr. Rand instead of arresting him. The issue here is *not* whether the officer had reasonable cause for a <u>Terry</u> stop; this issue was neither raised below or on appeal. Hypothetically, the officer certainly could have chosen the different strategy of simply talking with Mr. Rand, and patting him down if the officer feared for his safety (the trial court acknowledged that it would have been fine to do so). But the officer didn't choose this alternate course of action, or indicate the need to pat down Mr. Rand. It is not for the appellate court to roam into matters not previously raised. Whether the weapon might have been discovered via a <u>Terry</u> stop is a factual issue that wasn't developed below. And we aren't in a position to postulate about unpreserved, hypothetical matters now.

The bottom line here is that the officer disregarded the school's open-track policy. He said he "didn't take the time to look at the sign right in front of the gate" and he didn't investigate Mr. Rand's reasons for being at the track. Under these circumstances, we find no error in the trial court's decision not to give the officer's

13

sloppy work a Fourth Amendment pass.

## III.

The law and evidence support the trial court's decision to apply the exclusionary rule. The trial court's order granting Mr. Rand's motion to suppress is AFFIRMED.

JAY, J., CONCURS; KELSEY, J., DISSENTS WITH OPINION.

KELSEY, J., dissenting.

Appellee, Defendant below, was caught carrying a loaded gun on the grounds of a Jacksonville middle school at 2:00 in the morning. He was a convicted felon, and therefore did not have the legal right to carry the gun. Duval County School Police Officer R.A. Jackson arrested Defendant for trespassing, searched Defendant incident to arrest, and found the gun. Defendant moved to suppress evidence of the gun, arguing that the search violated his Fourth Amendment rights against an unreasonable search. The trial judge found that Officer Jackson was credible in believing that Defendant was trespassing and had reasonable belief to detain Defendant. The trial judge nevertheless granted Defendant's motion to suppress on the grounds that Officer Jackson did not conduct an adequate investigation before arresting Defendant.

14

We previously rendered a decision reversing the trial court's order granting Defendant's motion to suppress. State v. Rand, 41 Fla. L. Weekly D842, 2016 WL 1295081 (Fla. 1st DCA Apr. 4, 2016). Defendant moved for rehearing and rehearing en banc (the latter motion having now been denied). The Court ordered both parties to file supplemental memoranda on the applicable standards of review, and they did so. By that time, the judge who had concurred in the original opinion had retired from the Court, and the judge newly assigned to the panel voted to concur with the original dissenter's position, thus generating the present majority opinion affirming the trial court, from which I respectfully dissent.

**The Suppression Order.**

The trial judge entered a form order granting Defendant's motion to suppress evidence of the gun he was found illegally carrying, after stating on the record the reasons for entry of the suppression order, as follows:

> THE COURT: Okay. I took the time during my lunch break to read all of the cases that provided by the Defense, which is an inch thick and then I read, of course, the cases provided by the State. It is of the Court's belief and finding that the officer was credible in that he did believe that the defendant was trespassing, however had any investigation been done, there may have been a different outcome in this case. There was absolutely no investigation done to determine whether or not the defendant had a lawful reason to be on the property, all be it at 2:00 a.m. And that's a reasonable belief that he may have been doing something unlawful, but there was no investigation and had there been an investigation, it could have been different outcome. Therefore, I find that there was a reasonable belief to detain the defendant, but there was no probable cause for arrest, so the motion to suppress is denied, given

15

all the evidence in this case from both the State and the -- the motion to suppress is granted, given all the evidence presented by both sides.

(Emphasis added.)

To summarize: the trial judge found that Officer Jackson was credible, specifically that he was credible in believing that Defendant was trespassing. The trial judge also found that Officer Jackson had a reasonable belief that Defendant was doing something unlawful, and found that Officer Jackson had a reasonable belief to detain Defendant. The trial judge nevertheless concluded there was no probable cause to arrest Defendant, because Officer Jackson did not conduct an adequate investigation as to whether Defendant was lawfully on school grounds at 2:00 a.m.

**Standards of Review.**

(1) Presumption of Correctness.

All trial court orders come to this Court with a presumption of correctness. McNamara v. State, 357 So. 2d 410, 412 (Fla. 1978). This threshold presumption of correctness applies to a trial court's ruling on a motion to suppress as well. Pagan v. State, 830 So. 2d 792, 806 (Fla. 2002) ("[A] trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness . . . ."); State v. Gandy, 766 So. 2d 1234, 1235-36 (Fla. 1st DCA 2000) (applying presumption of correctness and interpreting evidence and reasonable inferences "in a manner most favorable to sustaining that ruling").

16

This threshold presumption of correctness, however, is only the beginning point of the appellate review process. A reviewing court also must identify the governing standards of review and then apply them properly to the factual and legal issues presented, to determine whether the threshold presumption of correctness withstands appellate scrutiny. A mixed standard of review applies here, which is deferential to findings of credibility, historical fact, and inferences drawn from the facts; and de novo for questions of law. Ornelas v. United States, 517 U.S. 690, 699 (1996) ("[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences from these facts by resident judges and local law enforcement officers."); Butler v. State, 706 So. 2d 100, 101 (Fla. 1st DCA 1998) (stating factual findings are reviewed for competent substantial evidence and application of law is reviewed de novo, "yoked to federal law" (under 1982 amendments to article I, section 12 of the Florida Constitution)).

Where the relevant facts are undisputed and supported by competent substantial evidence, we do not reweigh the evidence, but rather review de novo the application of the law to the facts. Ziegler v. Martin Cty. Sch. Dist., 831 F.3d 1309 (11th Cir. 2016) (holding question is one of law where historical facts are undisputed); Gandy, 766 So. 2d at 1235-36. Each aspect of review in the Fourth Amendment context is set forth below.

17

(2) Deference to Finding of Credibility.

Here, the trial judge made no findings of fact, but did expressly find that Officer Jackson was credible in his belief that Defendant was trespassing. A trial court's finding of credibility is entitled to deference, and the reviewing court cannot substitute its judgment of credibility for that of the trial court. Lowe v. State, 2 So. 3d 21, 29-30 (Fla. 2008) ("[T]his Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses . . . ." (quoting Blanco v. State, 702 So. 2d 1250, 1252 (Fla. 1997))).

The reviewing court also must give due weight to inferences that trial judges and local law enforcement officers draw from the facts. Ornelas, 517 U.S. at 699; Jenkins v. State, 978 So. 2d 116, 122 (Fla. 2008) (citing Ornelas, 517 U.S. at 699). A trial court finding that a law enforcement officer credibly believed a crime was being committed has special significance in the Fourth Amendment context. As discussed in greater detail below, the relevant perspective for Fourth Amendment analysis is that of the law enforcement officer, tested for objective reasonableness as of the moment of the challenged search.

(3) Construction of Historical Facts.

We review findings of historical fact for clear error, and give due weight to a law enforcement officer's inferences drawn from the facts. Ornelas, 517 U.S. at 699. One problem in this case, which has made our review more difficult, is that the trial

judge made no findings of fact other than that Officer Jackson was credible in believing Defendant was trespassing. Nevertheless, in this case the proper analysis does not turn on disputed facts. The relevant evidence was undisputed, leaving only a question of law. Ziegler, 831 F.3d at 1309. We would err if we ignored undisputed facts and reasonable inferences drawn from them that are relevant and necessary to satisfy the analytical demands of substantive Fourth Amendment law as discussed below.

(4) De Novo Review of Probable Cause.

The existence of reasonable suspicion and probable cause are questions of law reviewed de novo, with no deference to the trial court's ruling. Ornelas, 517 U.S. at 697 (requiring appellate court to conduct independent review of the ultimate legal determination of whether reasonable suspicion or probable cause exists); Jenkins, 978 So. 2d at 122 ("[D]eterminations of reasonable suspicion and probable cause should be reviewed de novo on appeal.").

(5) Totality of the Circumstances.

Fourth Amendment law requires us to evaluate reasonable suspicion and probable cause issues in light of the totality of the circumstances, including "the time of day, the location, the timing of the events, the route of the flight, and 'anything incongruous or unusual in the situation *as interpreted in the light of the officer's knowledge*.'" Cox v. State, 975 So. 2d 1163, 1167 (Fla. 1st DCA 2008) (emphasis

19

added) (quoting State v. Stevens, 354 So. 2d 1244, 1247 (Fla. 4th DCA 1978)). "Probable cause for arrest exists when the totality of the facts and circumstances *within an officer's knowledge* would cause a reasonable person to believe that an offense has been committed by the person being arrested." Hatcher v. State, 15 So. 3d 929, 931 (Fla. 1st DCA 2009) (emphasis added) (citing Chavez v. State, 832 So. 2d 730, 747 (Fla. 2002)).

(6) Officer Jackson's Knowledge and Perspective.

Defendant's subjective belief about the legality of his actions is irrelevant to probable cause analysis. Rather, we must analyze probable cause in light of Officer Jackson's knowledge and the circumstances of the encounter. Graham v. Connor, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175–76 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)); Hatcher, 15 So. 3d at 931; Cox, 975 So. 2d at 1167. Probable cause is judged objectively, from a reasonable officer's perspective given the facts and circumstances. State v.

20

Hankerson, 65 So. 3d 502, 506 (Fla. 2011); State v. Wimberly, 988 So. 2d 116, 119-20 (Fla. 5th DCA 2008). Hearsay evidence is admissible to show Officer Jackson's knowledge or understanding at the time of the arrest. Hayward v. State, 24 So. 3d 17, 37 & n.10 (Fla. 2009) ("Hearsay can be used to establish probable cause to arrest, even if it may not be used at trial."); Lara v. State, 464 So. 2d 1173, 1177 (Fla. 1985) (upholding admission of hearsay evidence in suppression hearing and noting that hearsay can be sufficient to establish probable cause) (citing State v. Wolff, 310 So. 2d 729 (Fla. 1975)).

In addition, probable cause is evaluated at the moment of arrest—the clock stops, time freezes, and nothing learned or occurring afterwards matters. "The reasonableness of official suspicion must be measured by what the officers knew *before* they conducted their search." Florida v. J.L., 529 U.S. 266, 271 (2000) (emphasis added); Baptiste v. State, 995 So. 2d 285, 294 (Fla. 2008) ("[T]he reasonableness of the officers' suspicion must be measured by the information that the officers knew *before* conducting the stop-and-frisk."); Griffin v. State, 150 So. 3d 288, 291 (Fla. 1st DCA 2014) (explaining that probable cause must be based solely on what is present and known at that point; "we stop the clock and observe the facts known to the officer").

The bottom line is that we collect what Officer Jackson knew and the circumstances confronting him at the time of the search, then we ask whether an

21

objectively reasonable officer with that same knowledge and under those same circumstances at that same time would have concluded that a crime was probably about to be committed or being committed. The question is not whether Defendant would be convicted of trespass. The question is whether it would have been objectively reasonable for someone in Officer Jackson's circumstances to think that a crime was probably being committed. Properly applying these standards and the governing law, Officer Jackson had probable cause and the motion to suppress should have been denied.

**The Evidence.**

Officer Jackson was a member of the Duval County School Police and was assigned the duty of patrolling the district's 168 public school grounds at night. He testified that he was trained in school trespass laws, and his understanding of the law was that "somebody that didn't have any legit purpose on the school campus and was not invited by a property designee, i.e., the principal, or one [of] her designees, they're trespassing on school grounds." He testified that this school is in a high-crime area and that he had previously made numerous arrests for trespassing and burglary on school grounds in the area. He testified that the principal of this middle school previously advised this officer specifically, as well as his fellow officers, that no people or vehicles were permitted on school property after hours at any time. Defense counsel objected to this testimony as hearsay, and the trial judge overruled

the objection, allowing it for the purpose of demonstrating its effect on Officer Jackson; i.e., his knowledge. Officer Jackson testified he had never seen anyone other than students walking on the track. Although Defendant introduced into evidence pictures of several adults walking the track together in the daytime, <u>no</u> evidence was presented of anyone else ever walking the track at or around 2:00 a.m.

Officer Jackson knew that this school is surrounded by a six-foot-high chain link and aluminum fence, and that there are several "no trespassing" signs around the property. He noted the existence of the perimeter fence and no-trespassing signs in the arrest report. Defense counsel also elicited Officer Jackson's testimony about the no-trespassing signs at the suppression hearing, questioning him about an e-mail he sent to the principal after this incident to discuss the signs. Officer Jackson knew that gates around the school were kept locked, and he did <u>not</u> know that one gate near the track was unlocked that night or at any other time. Officer Jackson did <u>not</u> know there was also a sign near the school track stating "No Track Access 7 A.M. to 4 P.M."

Officer Jackson was on patrol at approximately 2:00 a.m. when he saw Defendant on the middle school grounds, inside the fence. It was undisputed that Defendant was not on the track when Officer Jackson first saw him. Defendant admitted he was in an area of the school grounds between the track and school buildings, and facing a school building, about halfway between the track and the

23

street. He said it was necessary for him to cross that area to get to the track from the gate he entered. Officer Jackson testified that the building close to Defendant had windows with access to the classrooms.

Given these facts and his understanding of the law at the time, Officer Jackson believed Defendant was trespassing and also thought he might be on school property to commit burglary. Officer Jackson was alone, and his backup was at least eight minutes away. He was concerned for his own safety. Officer Jackson shone a light on Defendant and called out to him. Defendant immediately started walking toward Officer Jackson. Officer Jackson testified that sometimes suspects do approach him rather than run away, such as when they do not think he is there to arrest them. The gate closest to Officer Jackson was locked, and he unlocked it.

When Defendant got within earshot of Officer Jackson, he stated that he was just there to walk the track. As Defendant got closer, Officer Jackson asked him again what business he had for being on school property, and he repeated that he was there to walk the track. Defendant admitted that as he walked, he reached toward the front of his jacket—he said to keep it closed. Officer Jackson saw these movements and thought Defendant might be reaching for a gun. Officer Jackson testified that he was concerned for his safety because Defendant "kept putting his hands in his pockets, in his jacket pocket." Officer Jackson testified that he asked Defendant twice to remove his hands from his jacket pockets. Defendant did not deny that

24

Officer Jackson asked him to remove his hands from his pockets but denied that Officer Jackson asked him twice. Officer Jackson testified that "I did [have a concern for my safety] knowing that my backup was, you know, [a] ways away . . . and that it's just me and him in the middle of an open field that is poorly lit and, you know, he kept putting his hands in his pockets and I didn't know who he was and he didn't know who I was and I had a legit concern for my safety."

Upon reaching Defendant, Officer Jackson handcuffed him, arrested him for trespassing, and asked if he had a weapon. The arrest report, which was not introduced at the suppression hearing, states that Defendant denied having a gun. Officer Jackson searched Defendant's outer pockets and this search immediately revealed a loaded gun in a front pocket of Defendant's jacket. Defendant was charged with trespassing on school grounds while carrying a weapon, and possession of a firearm by a convicted felon.

At the suppression hearing, Defendant admitted he was a three-time convicted felon. He testified that he had walked this track at night fifteen or twenty times previously as part of his efforts to lose weight and reach a healthy blood pressure, as substantiated by several of his Facebook posts admitted into evidence over the State's relevance objection. Also over the State's relevance objection, Defendant testified that an officer at another school had told him it was permissible for him to walk the track at that other school so long as the gate was unlocked and school was

25

not in session, and that walking in the middle of the night fit his schedule. When asked if he could think of any reason Officer Jackson would think he was not actually on school grounds to walk the track, Defendant said the only reason for Officer Jackson not to believe him would be "because it's 2 o'clock in the morning [s]o in his mind, he wants to think I was there for something else other than that."

**Overview of Analysis.**

The majority's analysis seems to begin with the premise that Defendant was not trespassing, and then reasons that Officer Jackson made unreasonable mistakes as to both fact and law, thus acting unreasonably in arresting Defendant. Properly applied, however, suppression analysis under the Fourth Amendment does not turn on whether or not Defendant was, as a matter of law and fact, actually trespassing; that is, whether he would be convicted of trespassing. Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) ("The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest."); Seago v. State, 768 So. 2d 498, 499-500 (Fla. 2d DCA 2000) (reversing trespass *conviction* because State did not prove lack of authorization, license, or invitation; *but affirming* the arrest for trespass, which only required probable cause). Rather, the Fourth Amendment requires us to determine whether an objectively reasonable person <u>with Officer Jackson's training and understanding of the law</u>

26

(even if *reasonably* mistaken), under the circumstances facing him, would think a crime probably was about to be committed or was being committed. Applying the governing Fourth Amendment law to the facts, I conclude that Officer Jackson was not mistaken and that even if he was mistaken, his mistakes were reasonable and therefore he had probable cause to arrest Defendant.

Officer Jackson also had legal grounds to search Defendant for weapons for officer safety reasons because Defendant admittedly was reaching toward his jacket pockets as he walked toward Officer Jackson. In addition, the trial court found and Defendant has not contested that Officer Jackson had reasonable suspicion to detain Defendant for trespassing. Coupled with Defendant's admitted hand movements toward his jacket pockets, Officer Jackson therefore had the attendant right to frisk Defendant, making discovery of the gun inevitable. I will address probable cause to arrest first, followed by officer safety and inevitable discovery as additional grounds for the legality of the search.

**Officer Jackson Had Probable Cause to Arrest Defendant.**

Probable cause exists when an officer has reasonable grounds to believe that the defendant probably committed a crime. State v. Cuomo, 43 So. 3d 838, 841 (Fla. 1st DCA 2010) ("The existence of probable cause is not based on a formulaic determination, but rather on the probability of criminal activity."). We evaluate the totality of the circumstances known to an officer, testing whether a reasonable

person with such knowledge would believe the suspect was committing a crime. Hatcher, 15 So. 3d at 931; see also Dahl v. Holley, 312 F.3d 1228, 1234 (11th Cir. 2002) ("[A]rresting officers, in deciding whether probable cause exists, are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed."). We have held that an officer who observes a defendant committing the crime of trespass has probable cause to arrest the defendant and search him pursuant to the arrest. State v. Neely, 560 So. 2d 1230, 1231 (Fla. 1st DCA 1990).

What Officer Jackson knew at the point of arrest begins with the legal foundation in which he was trained and on which he performed his duties. He testified that he had been trained in, and was familiar with, Florida's school safety laws. Florida protects its school grounds by creating school safety zones "in, on, or within 500 feet of any real property owned by or leased to any public or private [school]." § 810.0975(1), Fla. Stat. (2014). Criminal trespass occurs when someone is on school grounds without "legitimate business on the campus or any other authorization, license, or invitation to enter or remain upon school property." § 810.097(1)(a), Fla. Stat. We have defined "legitimate business" under the school trespass laws as "any purpose for being there which is connected with the operation of the school." E.W. v. State, 873 So. 2d 485, 487 (Fla. 1st DCA 2004). Any law

28

enforcement officer may "arrest either on or off the premises and without warrant any person the officer has probable cause for believing has committed the offense of trespass upon the grounds of a school facility." § 810.097(4), Fla. Stat.

Every school principal is required to notify the appropriate law enforcement agency to prohibit people from loitering in the school safety zone, except for those with legitimate business, authorization, or license. See § 810.0975(2)(a), Fla. Stat. If no law enforcement officer is on site, a school's chief administrative officer or designated employee having probable cause to believe that a person is trespassing on school grounds is authorized to take into custody and detain such person "in a reasonable manner for a reasonable length of time" while awaiting arrival of a law enforcement officer. § 810.097(3), Fla. Stat. It is a third-degree felony for a person trespassing on school property to possess a weapon or firearm on the property. § 810.095(1), Fla. Stat.

Officer Jackson testified to his understanding that under the school safety laws, anyone on school grounds without permission or invitation was trespassing. Officer Jackson's understanding of the school safety law provision on trespass was accurate, and even if it had not been, it was objectively reasonable. Simply put, people should not be on school grounds in the middle of the night. He also testified that the principal of this particular school had told him and other officers that no one was permitted to be on school grounds at night. Defendant incorrectly argues that

29

the principal's instructions should have been excluded from evidence. To the contrary, the core probable cause analysis requires us to consider what Officer Jackson knew prior to the time of arrest. Hankerson, 65 So. 3d at 506; Hatcher, 15 So. 3d at 931; Cox, 975 So. 2d at 1167. Further, even hearsay can create probable cause for an officer to act without a warrant. Hayward, 24 So. 3d at 37 & n.10; Lara, 464 So. 2d at 1177. The trial court therefore correctly overruled Defendant's hearsay objection to this evidence.

The majority draws inapt analogies to "Interstate rest areas, post office lobbies, university event venues, campgrounds, parks, and the like." None of those places are school grounds in Florida protected by Florida's school safety code. None of the administrators of those places have advised law enforcement to keep people off of the grounds at night. None of those places are surrounded by fences bearing no-trespassing signs.

The majority likewise relies erroneously on four facts not known to Officer Jackson at the time of Defendant's arrest: (1) Defendant's after-the-fact testimony that another unidentified and non-testifying school employee at another school told him he could use a school track if a gate was left open; (2) one gate was left open on a different side of school grounds from where Officer Jackson encountered Defendant; (3) legal argument at the suppression hearing that the sign prohibiting access between 7:00 a.m. and 4:00 p.m. implicitly authorized access at all other

30

hours; and (4) pictures admitted into evidence at the suppression hearing depicting several adults on the track in daylight (though not at 2:00 a.m.). Reliance on these facts is improper for several reasons.

(1) First, probable cause does not depend on the perspective of an employee at another school. Proper analysis focuses on Officer Jackson's knowledge. He testified to his understanding of the school safety code, which directs that access to school grounds is determined on a school-by-school basis by the authorized personnel at each particular school. The policy at one school might not be the policy at another school. The principal at this school told Officer Jackson not to allow people on school grounds at night. That was the state of his knowledge, and it was objectively reasonable because it was consistent with the terms of the school safety code and Officer Jackson's training and experience—particularly in this part of town which was a high-crime area where he had made many prior night-time arrests for burglary and trespass.

(2) Second, the fact that a gate was left open on another side of the school grounds does not defeat probable cause, because Officer Jackson did not know the gate was left open and his unawareness of that fact was not unreasonable. The gate where he encountered Defendant was locked, and he had to unlock it to access the school grounds near Defendant. He thought that, consistent with the school safety code, perimeter fencing, no-trespassing signs, and the principal's instructions, all

31

gates were locked after hours. He testified that in his opinion they should have been locked, and that he advised the school after this incident to ensure that they be locked in the future. It was not objectively unreasonable for Officer Jackson to think that the gates were kept locked, nor was it objectively unreasonable for him to be unaware that one gate on one side of the property at one school among the many he patrolled was unlocked.

(3) Third, the access sign raises no material question of fact even though Officer Jackson testified he had not previously noticed the sign. His failure to notice one sign on the fence of one large, poorly-lit school campus among 168 in the school district is reasonable in light of his night-time working hours and his patrolling from a car. Even if he had seen the sign before, however, the issue would be how to interpret the sign. Interpreting the sign to determine whether it created a blanket license to enter school grounds at 2:00 a.m. is a legal question.

Defense counsel at the suppression hearing elicited Officer Jackson's testimony that his reaction upon learning about the access sign was one of concern because it was not consistent with his understanding of the law. After this incident and many months before the suppression hearing, Officer Jackson contacted the school principal to set up a meeting to discuss his concerns about the signs. It was not until cross-examination at the suppression hearing ten months after the arrest that Officer Jackson answered "yes" when asked if the sign prohibiting access between

32

7 a.m. and 4 p.m. could be interpreted as authorizing access to the track between 4 p.m. and 7 a.m. He was not asked to distinguish between neighborhood residents walking the track together in daylight and a lone individual walking on school grounds off the track at 2:00 a.m., but our de novo review demands that we examine that distinction.

I entirely disagree that it would be reasonable to assume by negative implication that this sign constitutes an open invitation to anyone and everyone to traipse about school grounds at 2:00 a.m. This sign on fenced, posted school grounds subject to Florida's school safety code has a different impact than would, for instance, a sign on a public street saying "no parking 7 a.m. to 4 p.m." One might reasonably assume that parking is permitted on that public street at other hours. In the context of protected Florida school grounds, however, such an interpretation is contrary to the letter and spirit of the school safety code, contrary to the directions of the principal at this school, and contrary to common sense. It is particularly inappropriate to fail to accord proper weight to the time of night involved here, which is significant to the legal analysis of objective reasonableness under the circumstances.

(4) Fourth, the undated pictures presented at the suppression hearing showing several adults on the track at an unidentified time in daylight do not resolve the relevant issues raised by Defendant's presence on school grounds off the track at

33

2:00 a.m. It makes a difference. That Officer Jackson had not seen people walking on the track in the daytime is not surprising given his night shift work hours, and it does not constitute an unreasonable mistake of fact.

Most importantly, none of this controls the suppression issue. Defendant should not have offered this evidence at the suppression hearing, and the trial court should not have allowed it. Griffin, 150 So. 3d at 291, 294 (explaining probable cause must be based solely on what is known at the point of arrest). Why Defendant was walking on school grounds, how many times he had previously done so without getting caught, what he allegedly had been told by someone else at another school, whether school employees failed to strictly protect the perimeter of this school's grounds, and how counsel interpreted the access sign at the suppression hearing, may be relevant to whether or not Defendant would be convicted of trespassing—but does not defeat probable cause. Officer Jackson did not know these facts at the point of arrest, and that lack of knowledge, on these facts, is not unreasonable.

Here, viewing the relevant evidence at the point of arrest, Officer Jackson had probable cause to arrest Defendant. Officer Jackson was trained in school safety laws, which he understood to prohibit access to school grounds at night; and he was assigned to patrol schools at night. The principal of this school had previously instructed Officer Jackson that no one was to be on the grounds at night. The school was surrounded with a fence and had posted no-trespassing signs. As far as Officer

34

Jackson knew, all of the gates were kept locked; and the gate between him and Defendant was locked the night of Defendant's arrest. Officer Jackson had never seen people on the track while he was patrolling at night.

This encounter occurred at 2:00 in the morning, on a dark part of a school campus, in a high-crime area in which Officer Jackson had previously made numerous arrests for trespassing and burglary. Although the majority reasons that the 2:00 a.m. hour of the incident is unimportant because there was evidence that other adults walked the track in the daytime, that reasoning dodges the issue of the significant likelihood-of-crime difference between daytime hours and the wee-small hours of the night. Common sense and common experience tell us that 2:00 in the morning is not a usual—or safe—time to be wandering around alone outside in a poorly-lit, high-crime area. Even Defendant said he carried a gun (illegally) at that time and place for safety purposes, and even he recognized the significance of the late hour: "because it's 2 o'clock in the morning [s]o in his [Officer Jackson's] mind, he wants to think I was there for something else other than that."

Defendant <u>admitted</u> he was not on the track when Officer Jackson first called out to him, and that to the contrary he was closer to a building and facing that building. Defendant <u>admitted</u> that as he walked closer to Officer Jackson, he grabbed at the front edges of his jacket, and he did not deny that Officer Jackson instructed him to get his hands away from his pockets (only denying that he asked it twice).

Only those facts known to Officer Jackson may be used to determine whether there were sufficient facts "'to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" Hankerson, 65 So. 3d at 506 (quoting State v. Betz, 815 So. 2d 627, 633 (Fla. 2002)). Reasonable mistakes of law and fact will not interfere with a finding of probable cause. See Heien v. North Carolina, 135 S. Ct. 530, 534, 536, 540 (2014) (holding reasonable suspicion can be based on reasonable mistakes of law, as well as reasonable mistakes of fact); Saucier v. Katz, 533 U.S. 194, 206 (2001) ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution.").

Officer Jackson was not mistaken as to either the law or the relevant facts. Probable cause is called "probable" for a reason. It is not a conviction, based on reasonable doubt, nor is it even a prima facie showing; it is simply an "assessment of probabilities." Hankerson, 65 So. 3d at 506. The Supreme Court has held that in the probable cause context just as in excessive force cases, the officer's "on-scene perspective" must be used to assess reasonableness. Saucier, 533 U.S. at 205 ("Because 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,' . . . the reasonableness of the

officer's belief as to the appropriate level of force should be judged from that on-scene perspective.") (quoting <u>Graham</u>, 490 U.S. at 396 (citations omitted)).

Under the totality of the circumstances including Officer Jackson's duty to protect public school grounds from crime, and especially in light of the time of the encounter and Defendant's motions implicating weapon and safety concerns, Officer Jackson discharged his duties appropriately. He had probable cause to arrest Defendant and search him, and therefore evidence of the gun Defendant was illegally carrying was not properly suppressed.

**Legal Error In Requiring Additional Investigation.**

The trial judge acted within her discretion in finding Officer Jackson credible, and correctly concluded that Officer Jackson reasonably believed Defendant was doing something unlawful, including trespassing, giving Officer Jackson reasonable belief to detain Defendant. These conclusions of law are fully supported by a de novo review. The trial judge erred, however, in concluding that Officer Jackson was required to conduct additional investigation. Nothing more is required than reasonable investigation under the circumstances. <u>See</u> <u>City of Clearwater v. Williamson</u>, 938 So. 2d 985, 990 (Fla. 2d DCA 2006) ("[T]he officer does not have to take every conceivable step to eliminate the possibility of convicting an innocent person"; the officer must only conduct a "*reasonable* investigation."); <u>see</u>

also <u>A.S.P. v. State</u>, 964 So. 2d 211, 211-13 (Fla. 2d DCA 2007) (finding only that trespass investigation failed to provide probable cause).

Officer Jackson had investigated the circumstances by patrolling the middle school area as part of his assigned duties as a school police officer, discovering Defendant on school grounds inside the fenced perimeter at 2:00 a.m., shining his spotlight on Defendant, asking Defendant what he was doing there, evaluating Defendant's explanation in light of Officer Jackson's own training and experience and disbelieving him, observing Defendant reaching toward his front jacket pockets, and instructing Defendant to keep his hands away from his pockets. At that point, Officer Jackson knew all he needed to know to justify arresting Defendant and searching him. Under the circumstances of this encounter, particularly after Defendant repeatedly reached toward his front jacket pockets while approaching Officer Jackson, Defendant's own actions cut off the possibility of further investigation. At that point Officer Jackson could not reasonably be expected to stand alone in front of Defendant chatting about Defendant's Facebook posts.

The trial judge's reference to requiring additional investigation appears to have resulted from Defendant's inappropriately focusing his arguments and evidence at the suppression hearing on proving that he was on school grounds to walk the track for exercise and that he believed he had a legal right to be there, even at 2:00 a.m. Those arguments, while potentially relevant to Defendant's actual guilt

38

and sentence on the trespass charge, are not relevant to the existence of probable cause, and the trial judge should have sustained the State's relevance objections to this evidence in the suppression hearing. The existence of probable cause depends on how an objectively reasonable person with the officer's knowledge and belief would assess the probabilities in the circumstances in which they arose—not how a suspect defends against charges after the fact. See Michigan, 443 U.S. at 36 (holding that actual guilt or later acquittal are "irrelevant to the validity of the arrest"). The proper test for the existence of probable cause is whether "facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe that an offense has [been] or is being committed." Chavez, 832 So. 2d at 747–48 (quoting McCarter v. State, 463 So. 2d 546, 548-49 (Fla. 5th DCA 1985)). The trial judge erred in ruling that this officer lacked probable cause because he failed to investigate Defendant's view of his rights or factors going to the likelihood of Defendant's eventual conviction or the severity of his sentence.

**The Search Was Valid For Other Reasons.**

**Officer Safety.** The search that revealed Defendant's gun was also justified by officer safety considerations prompted by Defendant's motions of reaching toward his front jacket pockets as he approached Officer Jackson. See Terry v. Ohio, 392 U.S. 1, 30 (1968) ("[W]here a police officer observes unusual conduct which

leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.").

Officer Jackson was alone in the dark with Defendant at 2:00 a.m., with his backup eight minutes away. Even if the encounter had started as a casual conversation when Defendant was many yards away from Officer Jackson, the situation changed materially when, as Defendant drew closer to Officer Jackson, he reached toward his jacket pockets. Officer Jackson testified that he saw Defendant making such motions. Significantly, Defendant admitted that he was reaching toward the front of his jacket, testifying that he did so because it was flopping open as he walked. Officer Jackson, however, suspected that these gestures indicated Defendant had a weapon and thus that Officer Jackson's safety was at risk. He testified that "I did [have a concern for my safety] knowing that my backup was, you know, [a] ways away . . . and that it's just me and him in the middle of an open field that is poorly lit and, you know, he kept putting his hands in his pockets and I didn't

40

know who he was and he didn't know who I was and I had a legit concern for my safety."

While Defendant and Officer Jackson had different explanations or suspicions about why Defendant was moving his hands toward his front pockets or waist area, the fact of the movements was undisputed, and justified Officer Jackson's search under these circumstances. A suspect's hand movements in the vicinity of pockets and the waist area are significant indicators of the possible presence of a concealed weapon, and such gestures are sufficient to support an officer's pat-down search to ensure officer safety. State v. Cruse, 121 So. 3d 91, 99-100 (Fla. 3d DCA 2013) (affirming officer's entitlement to pat down suspect who manipulated waistband and hiked up pants, which are known indicators of carrying a weapon) (citing Mackey v. State, 83 So. 3d 942, 945–47 (Fla. 3d DCA 2012) (holding that officer may conduct a search, not just a pat-down, based on observation supported by experience and training that suspect may be carrying a concealed weapon)); State v. Wilson, 566 So. 2d 585, 586-87 (Fla. 2d DCA 1990) (finding reasonable suspicion to frisk defendant who "repeatedly reached behind himself, touching the waistband of his pants")).

If there had been any point in this 2:00 a.m. encounter when extended casual conversation may have been feasible and safe, that possibility evaporated when Defendant walked toward Officer Jackson while admittedly grabbing at the front

41

pocket area of his jacket, triggering Officer Jackson's legitimate safety concerns and his right to protect himself. Officer Jackson was not required to place himself at risk of being shot by a convicted felon illegally carrying a loaded handgun on public school grounds in the middle of the night. Under these circumstances, Defendant's admitted actions of reaching toward the front pocket area of his jacket or waistband area as he drew near Officer Jackson justified Officer Jackson's immediate actions in neutralizing the threat that Defendant presented and searching him for weapons. He had that right under probable cause analysis and under reasonable suspicion analysis. The suppression order is erroneous for this additional reason.

**Inevitable Discovery.** Officer Jackson was also justified in searching Defendant for weapons once Officer Jackson had reasonable suspicion—as the trial judge concluded he did—that Defendant was committing or about to commit a crime, such as burglary or trespass. Discovery of the gun was thus inevitable regardless of whether justification for the search was based on reasonable suspicion, probable cause, or officer safety. See Nix v. Williams, 467 U.S. 431, 447-48 (1984) (adopting the inevitable discovery doctrine allowing admission of evidence even if it was obtained as the result of unconstitutional police procedure, if the evidence would ultimately have been discovered by legitimate means); Maulden v. State, 617 So. 2d 298, 301 (Fla. 1993) (recognizing inevitable discovery doctrine for Florida courts).

42

The bottom line here is that Defendant, knowing that he was a convicted felon, committed a crime (and exercised extremely poor judgment) by carrying a loaded gun on fenced public school grounds at 2:00 in the morning, and by reaching toward the pocket containing that gun while approaching a law enforcement officer. If Officer Jackson's search for weapons, whether it occurred incident to an investigatory stop, detention, or arrest, had revealed that Defendant was unarmed, in all likelihood the situation would have de-escalated and a more extended conversation could have occurred, in all likelihood ending very differently for Defendant. Officer Jackson and all other law enforcement officers who must make on-the-spot judgments under dangerous circumstances should be applauded, and not vilified, for maintaining public safety and enforcing the rule of law.

**Conclusion.**

Applying the governing probable cause analysis under the correct standard of review to the legally relevant facts—those known to Officer Jackson viewed in the circumstances that existed prior to the arrest—leads to the conclusion that the trial court erred by concluding that probable cause did not exist and suppressing evidence of the gun Defendant was carrying. Even absent probable cause, the evidence should not have been suppressed because a weapons search was authorized under Terry and for officer safety. Accordingly, I must respectfully dissent.

43